May it please the Court, good morning. I represent the Appellant's Court of Appeals, and I'm here This Attorney Fee case arises out of a very complicated medical negligence or medical malpractice case that was settled in part and tried in part. One of the moving forces in this case was an attorney named Katrina Taraska. She worked for the Appellees for a period of time and helped keep this case alive. In June of 2008, a written agreement was entered into with the Appellee Law Firm, the Goldberg & Goldberg Law Firm, which had been located by Ms. Taraska to continue and help with and take over the prosecution of the medical negligence case. At the time that agreement was entered into, the status of the case was that it had been refiled after a voluntary dismissal. There had been some written discovery in the filing of a 2622 Affidavit of Merit. A year later, Ms. Taraska decided to leave her law firm, the Appellee Law Firm, and sent out a notice to the clients on a form that had been agreed to by the parties. That notice advised the clients, including Mr. Grain, that she was leaving and included a form for the client to check as to where the client wanted the file to go. Mr. Grain checked the box on the form that he wanted the file to stay with Ms. Taraska, who had announced that she was leaving and going to the Goldberg & Goldberg Law Firm. Mr. Grain, the client, the plaintiff in this case, signed an affidavit below reciting a conversation he had with an attorney from the law firm, the Appellee Law Firm, at the time this form went out and Ms. Taraska's letter went out announcing that she was leaving the Von Aachen Firm and going to Goldberg & Goldberg. Mr. Grain said in his affidavit below that Mr. Gentry from the Appellee Law Firm contacted him upon this letter going out and during this call Mr. Gentry instructed Mr. Grain not to sign anything from Taraska and I'm quoting, As the Von Aachen Firm had not come to an agreement over fees, which Gentry claimed the firm was entitled to be paid. In response, Mr. Grain said, I told Mr. Gentry that I had already made my decision and signed the letter checking the box. I'm reading from the affidavit, your honors, at page 9032 and 9033 of the record. Now, this case settled for $7.5 million and an issue arose as to the fee. The Appellee Law Firm filed a petition to adjudicate its fee interest as did the Goldberg & Goldberg Firm filed a petition to adjudicate the Appellee fee interest. The circuit court below did not, as the Appellee argues in this court, conduct some sort of balancing of all the quantum Merowith factors and come to some exercise of discretion as to what the amount of the quantum Merowith should be. Well, how do you measure the worth of filing this lawsuit in a timely fashion in 2006, which ultimately enabled the settlement? How do you measure that? Well, your honor, there's no question that refiling the case is the first step. I mean, it almost sounds silly for me to say it, is the first step for the case to be settled years later. But it's the first step. It's not the last step. It would have been if she hadn't filed it in time. To be sure. But it can't be viewed as the sole proximate cause of the result here. It certainly was an important step. I can't deny that. But how do you measure it? Let me answer the question negatively, your honor. You don't measure it by enforcing the June 24, 2008 written agreement as a contract that still existed, which it did not because it was terminated. Judge Lyons below said on the last page of his ruling, I find that the written agreement executed on June 24, 2008 is mostly dispositive of the issues herein. I don't think there was any attempt to measure the importance, frankly, of the refiling, which to be sure is important. The efforts made by the plaintiff to discharge VLTS after Tarasca left do not extinguish VLTS's legitimate claim for its share of the fee ultimately enjoyed by Goldberg via Tarasca. So it is our position, your honors, that the trial judge enforced as a written contract the June 24, 2008 fee-sharing agreement that had been abrogated and canceled when the client terminated VLTS a year later. There is a lot of discussion in the briefs about Rule 1.5 of the Illinois Code of Professional Responsibility, but Rule 1.5 requires the client to consent to a division of fees. The client here initially consented and then withdrew his consent. He canceled and terminated the VLTS law firm. We submit that the circuit court cannot simply ignore that and say that the efforts made by the plaintiff to discharge the EPLI don't make a difference. They've always made a difference. When the client fires somebody under a contingent fee agreement, that's it. There is no contingent fee agreement. That's been the law. I don't have to spend a lot of time on that. The circuit court said in its ruling accordingly a 30 percent share of attorney's fees for VLTS would be awarded, I'm paraphrasing, of which 30 percent is $588,750. I think Appalachian Council has done a wonderful job trying to turn this into an exercise of discretion that can only be reversed for an abuse of discretion. But it's plain on the face of the ruling that was made below that this was a straightforward mathematical application, percentage application of a fee sharing agreement that had been canceled. And not only had it been canceled, but when Katrina left her prior law firm and they contacted Mr. Green, they said don't sign anything, there is no agreement now. But the trial judge enforced an agreement that had predated all that, that these lawyers themselves knew didn't exist anymore. The EPLI cites extensively in their brief the Callahan case. The Callahan case says that the quantum error claim accrues immediately after discharge. But the argument is made to this court, okay, the discharge here was 2009, the case was settled in 2012, three years later. This isn't a night before discharge where the lawyers fired on the eve of a settlement, that didn't happen here. Three years after the discharge, the claim accrues. I mean, at the time of discharge in 2009, the claim accrues. But is the appellate's position that they nevertheless retained an interest in the ultimate result that Katrina and the Goldberg firm obtained three years later? After 30 or 40 depositions, $400,000 of costs expended, this case respectfully was nowhere near resolution. To be sure, it had been refiled, but it was a very complicated neurosurgery case that involved numerous experts, numerous depositions, all kinds of literature review that culminated in the $750,000 settlement. Yes, but she left in 2009 to go to affiliate with Goldberg and Goldberg. She remained on the case, but so did all the other lawyers at Goldberg and Goldberg, Mike Cox, Barry Goldberg, Barth Goldberg. The whole firm was marshaled. The resources of the whole firm were marshaled, and they invested $400,000 in the prosecution of this case. And to go back to the original fee-sharing agreement that existed when Ms. Taraska was at her prior firm and just enforce it as a contract, take a percentage, multiply it by 30%, is just contrary to what the law is in this area. It is not... Well, do you have us do that? Remand it for quantum merit? An assessment of quantum merit? Well, Your Honor, our brief, that's one of the elements of relief requested in our brief. What happens if Judge Lyons thinks it was worth more than $500,000? Well, Judge Lyons did not weigh all the quantum merit factors. He applied a percentage formula under a contract. Now, our position in this court is they had the burden of proof as the claimant to substantiate the elements of quantum merit, and they did not. So the first item of relief we ask for is an outright reversal, respectfully. As harsh as that may sound, that is the first element of relief requested. To be sure, there is an alternative request for a reversal and a remand. But we ask the court to not let a 30% times the unenhanced fee stand as that's not an exercise of discretion. That's applying a formula that's not permitted under the law, and can I reserve my remaining time? Thank you. I do have a question. I'm sorry, Your Honor. You said that it wasn't until three years after she left the firm to go with Goldberg that there was a resolution, but the settlement from which all of these funds are derived happened in 2010, correct? No, 2012. So the settlement with the medical center was in July of 2012? Yes, Your Honor. I'm sorry. There were unsuccessful mediation attempts prior to that, but the actual settlement occurred in the summer of 2012, three years after the appellee was discharged. Okay. Thank you. I apologize for starting to walk away when you had a question. Are there any other questions before I sit down? It's hard to get away sometimes. Thank you, Your Honor. Thank you. Mr. Reagan. Thank you. I have some specific things I want to talk about, but I'd like to take up two things that were mentioned. First of all, his primary argument was that the trial judge simply enforced a contract, and that's not true. He quoted, counsel quoted only from the last page of the order, but the precedent, says that the case before me, however, is not a mere fetal referral case in the middle of the page, and then he launches into what Tarasco did, starting off by saying, miracle worker Tarasco took Green's case, et cetera. So the notion that all that he did was to blindly enforce a contract is simply not true. Secondly, counsel has brought up the notion of accrual, saying that the cause of action accrues at an early time, and therefore you shouldn't look at anything that happens after that. And that's not the law, and I'll pick that up as I go, but Justice Miller's additional opinion, both concurring and dissenting in Callahan, has a sentence which addresses that specifically, where he says in certain circumstances it may be appropriate to postpone this determination, meaning quantum error, pending resolution of the underlying matter, even though the attorney's cause of action accrues at the time of discharge. So determining when a cause of action accrues does not speak at all as to what time you make the measurement of the value of the fee. So there's only one issue in this case, and that is whether the appellants here have demonstrated an abuse of discretion by the circuit judge in making his quantum error determination. But the Goldberg firm has never, frankly, addressed that issue. Instead, they've attempted to address or to raise various legal issues, but I say with respect that none of those issues has been supported by colorable authority. We have refuted each of those issues in our brief, and they chose not to file a reply brief. The standard of review here is the highest appellate hurdle which the law recognizes. The Goldberg firm has showed not only that the trial judge abused his discretion, but that discretion is described on this particular issue as being very broad, and this court, from its long collective experience, knows that that is the most deferential standard of review available, short of, as the cases say, no review at all. There's an additional wrinkle in this case, and that is that the judge who made the quantum merit fee determination was also the trial judge for all of these significant events in the case. And we've demonstrated, documented in our brief, that a judge in that position is not limited to the raw evidence in the case, but may draw upon his own observations and his own experience in arriving at a reasonable fee. So even though I'm going to take up their legal issues here in a minute, but I just want to spend some time talking about the fact that this quantum merit reward is amply justified in this case. So the real history of the case begins in 2002, and from 2002 to 2005, two firms worked on the case, that's three years, and it was voluntarily dismissed for lack of an expert. And in April of 2006, less than three days short of the one-year anniversary of that dismissal, which of course would be the ironclad death knell for the case, a Vanaken partner, it doesn't matter who it is, it happened to be Katrina Teraske, but nonetheless, a Vanaken partner agreed to work on the case. And so in that less than 30-day period, she evaluated the case, and if you can picture for a moment this thing coming in in boxes, starting fresh, found an expert, obtained the affidavit for certificate of merit, and refiled the case in a manner sufficient to withstand two motions to dismiss. But then she continued to work on the case. And in March 2007, essentially a year later, she referred it to the Coplin Law Firm. And it was determined in pretty rapid order that that arrangement was not satisfactory. So in September of 2007, that was changed. Goldberg wrote below that they were retained in late 2007 with their first contract, although this is not a big issue of the case, I don't mean to suggest that. But their first contract with Vanaken and Mr. Green was made in late June of 2008. And there the referring attorney was to receive 30%, with 70% going to the Goldberg firm. But Katrina continued to work on the case, and with the only change being that at about that time she stopped keeping time records. But she worked steadily on the case as a partner of the Vanaken firm until she left more than a year later in August of 2009. So a Vanaken lawyer, and we're talking about the Vanaken fees here, saved the case under perilous and difficult conditions, worked on it continuously from April 2006 through August of 2009, more than three years, advanced $27,000 in expenses, made a qualified referral to a competent firm. And as the court well knows, that the making of that referral alone justifies substantial fees without any work attached to it, so long as the lawyer agrees to accept the same legal responsibility as the receiving attorney. They expended, in a minimum, 1,200 hours, and most probably 1,700 hours on the case. And during that whole time they were at risk for any recovery of their fee or for their expenditures. And the end result of this effort, obviously aided by the Goldberg firm, was a very good one for the client. The discharged attorney is to be given a fee in quantum merit that literally and legally means as much as is deserved. So measuring this effort against the standard of review, it cannot possibly be said that no reasonable person would agree with the position adopted by the trial court. And unless, I say with respect, you can come to that conclusion, that no reasonable person would ever have agreed with this decision by the trial judge, then the appellant has failed in attempting to obtain reversal here. So let's turn to the legal arguments they raised. Many of these legal arguments are irrelevant to this case completely. None of them were sufficiently legally supported in their brief, and the law is to the contrary of their position on every single issue. The Bannock firm has a valid lien, but even if it didn't, it would be of no consequence to this case. We can go into when the lien was served, but they haven't raised any issue on that in their argument today, so I'll skip over that. They argue at length in the brief that you have to state what the amount of the plain lien is. That's not true. The Peterson and Haupt case recently says that's essentially impossible. When you file an attorney's lien, how would you know in most cases what it's going to be? But fundamentally, all of that's irrelevant because we don't need a lien to succeed in this case. You can sue on a lien, you can enforce lien rights, but you can also simply make the quantum error claim, and that's exactly what was done here. That's exactly what was done in Rose v. Northwark and Western in the Supreme Court, and the 2012 Peterson and Haupt case says it is, quote, well settled that recovery may be had outside of the attorney's lien act. The money's in escrow. It's not as if somebody was short of notice on this, but most fundamentally the Goldberg firm never argued below that we don't have the right to proceed. I mean, they harped about the service of the lien, but they never made an argument there and they don't make an argument here that we don't have quantum error rights that we can proceed on. They made a claim that we should have made our claim sooner. There's simply no support for that, and we've heard that in the brief, and they haven't argued it here, I don't see the point. It seems, Mr. Regan, that both of you are arguing that quantum error would apply. Yes. And I would agree. I guess the question is, how is that determined? Because it does appear that the trial court here simply said, well, you know, you should put a lot of work in, and I think that 30% is not unreasonable, and that's what I'm going to do. At least that's the math. No. But there was no, I know there were hearings, but I mean, there was no hearing on, you know, on H, I think it's H, attorney's fees factors going to this, which would make a quantum error case in this case. They were. Please. No, please. No, no. It just seems that the actual validating of her hours, and I know there are issues there, too, but her hours and the dollar attachment to each hour that she spent and whether she was successful and how difficult the case was and all that. I mean, they were kind of considered, but there was really no evidentiary hearing on all of it. Well, there was no dispute. Well, actually, and I've documented this in the brief, that the facts came before the court on agreed pleadings, and I've listed where all those pleadings would be found in the record. So everything that we submitted was backed by an affidavit, and so that's the way in which the facts came before the trial court, and then when you look at that and when you compare it to the arguments that were made below, the man arguing for his firm said that we're relying not, you know, we're not relying just on an hourly basis here, but rather the quality of the work, and so there was not, you're absolutely right that there was not a hearing, but there didn't have to be because it was almost like a summary judgment procedure, if you will, and that's how the facts got before the court, even though there were disputes there. I mean, it wasn't truly summary judgment, but the facts came in the way of an affidavit. So you're saying those facts can be kind of plucked from wherever they were discerned in the hearings? Yes, yes, and of course it goes without saying, and I will tell you it's so, that every fact we rely upon we cite, and it is to be found in a pleading which is backed by an affidavit in every single instance, and so that's how the facts came before the court, and then that was sufficient. Nobody was complaining that, you know, there should be a more extensive hearing, and certainly the Goldberg firm never said there should be a more extensive hearing. So copious facts brought before the court by way of affidavit. So in much the same vein, you know, might Judge Lyons have written a more extensive opinion had he known that we would be standing here today? That's for him to decide. But this review is de novo, and therefore the stated reasons of the trial judge aren't controlling, and the question is what does the evidence look like to this court, and you can find in the court's opinion, in Judge Lyons' opinion, various things including the consideration of the contract, and we've documented in spades in our brief that that's a valid consideration. So the court can, should, look at the value of the case and the outcome of the case and the benefit for the client. Because of time, I'm going to have to short circuit some of this. But looking at the outcome of the case is absolutely a permissible factor. Callaghan talks about the amount and importance of the subject matter, the degree of responsibility involved, and the benefit resulting to the client. Rule of Professional Conduct 1.5A says in defining a reasonable fee, you look at the amount involved and the results obtained, and whether the fee is fixed or contingent. And Justice Miller's separate opinion in Callaghan, I keep going back to it, I mean, I realize it's a separate opinion, but he knew where the law was going in this area, and he says you look at what may ultimately be recovered, and for that reason, maybe you should decide these questions at the end of the case. Thank you. Court making a quantum error with determination is also permitted to consider that there was a contingent fee agreement and a percentage of that fee. It's not controlling. We don't say that it was, and we also suggest, as I started this argument, that the judge did not say it was controlling, and he, on the preceding page, says look, this is not just a fee referral case, but New York has held since at least 1932 in the Tillman case that you look at the, one of the factors you can consider is that the discharged attorney is working on a no longer binding contingent fee contract, and what that amount was. And Callaghan cited Tillman with approval, although not on that particular point. Callaghan court also cited with general approval the Booker case from the Hawaiian Supreme Court in 1982, which said the same thing, even though Callaghan did not cite it for that particular purpose. We've cited other cases from Massachusetts and Michigan doing the same thing, and the court said that even though the contingent fee agreement has been aggregated, that the terms of that form of contract still provide, quote, helpful guidance. And considering the terms of that form of contract fit within the Callaghan and the RPC 1.58 factors, one of which is whether the agreement was contingent or not. The Binacken firm was always at risk on its fee. What Binacken did was braver here than what Goldberg did in terms of getting into this case, because at that point they had less than 30 days. They were at risk for being sued. They had nothing. They had a problem is what they had, and they solved it and took it on and then continued to work on it for three more cases. I mean, you know, they would have a great case if that's all they did was save it and then refer, but that's not what happened here at all. If they had done that? Pardon? If they had done that, just saved it and referred it. Traska never joined the firm, the Goldberg firm. Right. And she stayed with her other firm. What would have been the fee arrangement at that point in time? It would, Goldberg would be no worse off than it is right now. I mean, they were contracting. The reason I asked the question before, if we remanded for a hearing on Quantum Merowith, perhaps, wouldn't it be unfair if Judge Lyons thought what they had done was worth more than 30%? I mean, that would be not so fair. Right. And, you know, so I mean, I guess if it's sent back for a reasonableness, then, you know, who knows exactly what's going to be fair. But Goldberg was committed to doing this on a 70% fee, and it is only this extraordinary circumstance that they've hired the referring lawyer. So what Lyons did in that put them in a worse off position. Exactly. And that is my concluding remark because I'm out of time. Thank you. And they have been treated fairly. But more than, I mean, the concern here is not whether they've been treated fairly, but whether they've shown that there's been an abuse of discretion with respect to the Bannocken case claim. And I urgently ask that the Court be affirmed. Thank you very much. Thank you, Mr. Ragan. Mr. Anderson. Thank you, Justice Lyons. In order to analyze an abuse of discretion claim, there has to be an exercise of discretion in the first instance. That did not happen here. There was simply an enforcement of a 30% referral agreement that had been entered into in 2008 when Katrina was with the Bannocken firm. Which agreement was canceled by the client, and then there was another agreement in August of 2009 signed by the client and the Goldberg and Goldberg firm at pages 8921 to 8923 of the record, which was the operative agreement when the case was settled. The trial judge is not exercising discretion by going back to a 2008 agreement that had been canceled by the client and then abrogated by the entry into a new agreement in 2009 with the client, Katrina, as the referring lawyer. And Katrina was always the referring lawyer. When she was at the Bannocken firm, she was the referring lawyer. When she went to Goldberg and Goldberg, she was the referring lawyer. So what happened here is the trial judge agreed with the Bannocken firm because the court will find at page 8982 of the record that the supplement to the petition filed by the Bannocken firm asked for $750,000 in fees based on a 30% referral fee. They filed a supplement to their petition seeking just a straight percentage of what they would receive as a referring lawyer had they not been discharged and had they stayed in until the end of the case. Well, they didn't stay in until the end of the case. And for counsel to blithely say, well, you know, what they did was really more significant or momentous than what the Goldberg firm did, I unfortunately happen to know what it's like to take 20, 30, 40 depositions in a medical malpractice case and to spend hundreds of thousands of dollars on costs. And Mr. Goldberg was seriously at risk until that case settled on the eve of trial in 2012. With all due respect to Justice Miller's separate opinion, the benefit conferred is the benefit conferred by the Bannocken firm. That's the criterion. Justice Litton referred to the eight criteria for quantum merit. It's not the benefit conferred by Goldberg and Goldberg that measures what the Bannocken firm should get. It's the benefit that they conferred on the client. I'm not standing here saying they didn't confer a benefit on the client by refiling the case. They obviously did. I mean, it would be silly for me to say that. But it's also silly to say that their quantum merit, the reasonable value of their fees, should be measured by what successor counsel did for three years after they were discharged. All the cases say that the 2008 contract was canceled and terminated after the client discharged the Bannocken firm. The cases say, I mean, there's so many of them, but they all say the same thing. The contingent fee contract after discharge is canceled. The remedy is quantum merit, reasonable value. Thank you so much. Counsel referred to affidavits and facts in the file when Justice Litton asked about what facts were used. I read to you that Mr. Green's affidavit, that the day the letter went out from Katrina saying, I'm leaving Bannocken, I'm going to Goldberg and Goldberg, check the box of who you want to keep the case, he got a phone call from Mr. Gentry. Don't sign anything. We don't have an agreement yet. Well, if they didn't have an agreement on the fees in June of 2009, then how is the trial judge enforcing a June of 2008 written agreement? Can't be. That's not an exercise of discretion. The rule is Hornbook appellate law that in order for there to be an abusive discretion standard, there has to be an exercise of discretion, not merely multiplying 30% times a number. The fact that he gave them $500,000 instead of $700,000, doesn't that show that he did exercise some discretion? Well, what he did, Justice Wright, was he took the 30% and multiplied it by the unenhanced fee. Goldberg and Goldberg had asked for a one-third fee for extraordinary services under the medical malpractice statute. And Judge Lyons had awarded them the one-third fee as an enhanced fee because that increases from the percentages in the statute. So he multiplied the 30% not by the enhanced amount that Goldberg and Goldberg was entitled to, but by what the fee would have been under the statute without the extraordinary services enhancement. It's still a mathematical 30% application to a number which is not an eight-factor evaluation of what the reasonable value of the services were. What do you think the reasonable value of the services should be? Well, I think... And you can decline to answer if you think... I'm not going to decline to answer. I'm standing here as an advocate. If the court asks a question, I'm going to answer it. I think the starting point for the reasonable value of the services should be, and I know counsel objects to this under Rule 408 to be candid with the court, but the court asked me a question, I'm going to answer it. There was a demand made for $300,000 and some thousand dollars by the Menachem firm. Now that demand was denied and rejected by the lawyers I represent, but I don't think we should start at $570,000 or $80,000 or $750,000. These lawyers thought themselves at the time before hearing that their time was worth $300,000. Now I personally... Okay, you've answered my question. The first remedy you want is an outright reversal. Correct. So I'll take your answer as implying you think it's worth something rather than nothing. Well, I don't want to be disingenuous. I mean, as you pointed out, Justice Wright, the case was refiled. Katrina got it refiled when she was there. I thank the court. Thank you, Mr. Ragan. Thank you as well, Mr. Ragan. And we will take this matter under advisement and get back to you with a written statement within a short day. And that's a short recess for me.